Filed 6/15/16  P. v. Johnson CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D069901 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF1303352) |
| SHAUNTE LAMONT JOHNSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Charles J. Koosed, Judge.  Affirmed.

Sharon M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Randall D. Einhorn and Peter Quon, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

In September 2014 a jury found Shaunte Lamont Johnson guilty of one count of forcible rape (count 1: Pen. Code,[1] § 261, subd. (a)(2), hereafter § 261(a)(2)) and one count of forcible oral copulation (count 2: § 288a, subd. (c)(2), hereafter § 288a(c)(2)). Jane Doe[2] was the victim of both offenses. In a bifurcated proceeding, the trial court found to be true allegations that Johnson was convicted in 1991 of voluntary manslaughter (§ 192, subd. (a)), which qualified both as a serious felony prior conviction (§ 667, subd. (a)) and as a strike under the Three Strikes law (§§ 667, subds. (c) & (e)(2)(A), 1170.12, subds. (c)(2)(A)), and that he also was convicted in 1991 of attempted first degree murder (§§ 187, subd. (a), 664) and mayhem (§ 203), which qualified as additional strikes under the Three Strikes law.

Prior to sentencing the court denied Johnson's motion under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*) motion to strike his three prior strike convictions. The court also denied Johnson's motion for a new trial, which was based on his claim that his trial counsel rendered ineffective assistance of counsel.

On January 12, 2015, the court sentenced Johnson as a third strike offender to an indeterminate state prison term of 50 years to life and a consecutive determinate prison term of five years, for an aggregate sentence of 55 years to life. The sentence consisted of 25 years to life under the Three Strikes law for Johnson's forcible rape conviction (count 1), plus a consecutive term of 25 years to life under the Three Strikes law for his

---

[1]    All further statutory references are to the Penal Code unless otherwise specified.

[2]    Throughout the trial court proceedings in this case, the complaining witness was referred to as Jane Doe. We shall refer to her as Doe.

forcible oral copulation conviction (count 2), plus a consecutive five-year term for the true finding that he had suffered a prior serious felony conviction (§ 667).

Johnson raises four contentions on appeal. First, he contends the judgment must be reversed because the court abused its discretion and violated his constitutional due process right to a fair trial by allowing the prosecution to introduce irrelevant and unduly prejudicial evidence of his gang affiliation and tattoos. Second, he contends the judgment must be reversed because the court abused its discretion and violated his federal constitutional rights to due process and effective assistance of counsel by denying his motion for a new trial. Third, he contends his count 2 conviction of forcible oral copulation must be reversed because the court erroneously failed to give sua sponte a unanimity instruction under CALCRIM No. 3500. Last, he contends the court's refusal to grant his *Romero* motion constituted an abuse of discretion and the resulting prison sentence violated the federal and state constitutional prohibitions against cruel or unusual punishment because (1) his prior strike offenses and his criminal history place him outside the scope of the Three Strikes law, and (2) his sentence is a "de facto term of life without parole for an offense which amounted to date rape." We affirm the judgment.

FACTUAL BACKGROUND

A. *The People's Case*

Doe testified that she met Johnson in September 2010 while she was walking home on Chestnut Street in Riverside. Johnson drove up alongside Doe, slowed his car, and told her he would like to talk to her. Doe told him to pull his car over by her house and she would talk to him there. She wanted to speak with him at her home because a

3

pastor and others were there outside the house and she wanted them to see her because she did not know Johnson. When he stopped his car by Doe's house, Johnson told her his name was "Nico," they spoke for about 15 minutes, and she gave him her telephone number.

After their initial meeting, Doe spoke to Johnson on the telephone a couple of times. Johnson came to Doe's house again and they spoke for about 30 minutes. Johnson told Doe he liked her and he wanted to date her. Doe told Johnson she did not want to date him.

During that conversation, Doe noticed that Johnson had the number "120" tattooed on him. Johnson talked about how the tattoo had some kind of affiliation with 120. Doe testified, "I guess it's a street, but I don't know if it's something [that] has to do with a gang or something like that." When the prosecutor asked Doe whether she and Johnson talked about gangs, Doe testified, "He told me he was affiliated with Crips."[3]

On September 24, 2010, Johnson met Doe at the downtown Riverside bus terminal and drove her and her luggage to her house. Doe testified that when they arrived at her house, no one was there, so she agreed to accompany Johnson to Corona where he was going to tattoo some people. Johnson told her he would drive her back home later. Doe's luggage and personal belongings remained in Johnson's car in the front with her. He told

---

3  The court interrupted the prosecutor's direct examination of Doe and admonished the jury: "Ladies and gentlemen, that testimony is coming in not for the truth that that's actually true, but to show the impact of the effect on the listener in this case, the witness."

4

her that he was interested in having a romantic relationship with her, but she told him that she was not interested in that type of relationship with him. (I RT 109, 142.)

Johnson and Doe visited with Johnson's friends in Corona and, after Johnson finished the tattooing job, he and Doe left Corona and drove to a 7-Eleven store. It was dark when they left Corona. After they left the 7-Eleven, they smoked some marijuana in the car.

Doe testified that, as Johnson drove her back from Corona to Riverside that night, she became scared when he told her, "You know what, I am never going to take you back to where I got you from." Doe testified that she is five feet four inches tall and Johnson is a lot taller.

Instead of driving Doe to her house, Johnson drove her to a park in Riverside and stopped the car. Doe testified that when they got out of the car, she "started trying to stall." Doe explained she was "stalling" because she "didn't want to have sex with him." Trying to find somewhere to go to get away from Johnson, Doe told him she needed to use the bathroom. Johnson told her he was going to walk her there, and Doe told him, "I can do it." Doe walked around the car to get away from Johnson, but he forcefully grabbed her upper body from behind with both of his arms and told her to get into the car and take off all of her clothes. Doe testified she tried to get away from Johnson but he was holding her so hard she could not get away. Doe told him she was not ready to do anything like that, and Johnson said in a normal tone of voice, "You don't have a choice." Doe told him, "I don't want to do this." With a smirk on his face, Johnson told her again she did not have a choice.

5

Doe complied with Johnson's demand that she get into the car because she knew she could not get away from him. She told Johnson, "Well, please if we got to do this, can you please use the condom?" Johnson put on a condom and, despite Doe's repeatedly telling him she did not want to have sex with him and that she wanted to go home, he told her she did not have a choice and then put his penis into her vagina.

The prosecutor asked Doe, "[W]hy didn't you fight more?" Doe testified she "was scared" because "[she] didn't know if [Johnson] had a gun in that car or what he might do next, or anything. And obviously [she] couldn't overpower him." The prosecutor asked what made her think Johnson had a gun. Alluding to Johnson's statement to her indicating he was affiliated with the Crips, Doe replied, "I mean, like he already said about his past and stuff like that. And then I see what he is doing to me. I don't know if he has done this before, or if he had this plan for me. So you know, I am just expecting anything to happen, that he will do anything. And I didn't put nothing past him at this point."

Doe testified that when Johnson took his penis out of her vagina, he took off the condom and, in a demanding voice, told her to "suck" his penis. She complied. The prosecutor asked Doe why she performed oral sex on Johnson, and she replied, "Because I just wanted to do whatever I had to do to get out and stay alive." Doe also testified that at "around the same time" she had to orally copulate Johnson, he put his mouth on her vagina.

After the acts of oral copulation, Johnson told Doe in a demanding and "[s]ort of angry" voice to turn around because he wanted to have anal intercourse with her. Doe

6

told him, "No, please, please, please, please." Johnson grabbed her and, as they were shifting positions, Doe escaped from Johnson's car and ran scared and screaming to a car that was driving through the park. Doe testified she was only wearing a bra and tank top.

Doe jumped into the passing car. She testified she told the people in the car, "Please, please, go to the police, go, go." When they asked her what happened, Doe told them, "That guy just raped me."

Cristo Lopez, the driver of the car, testified that Doe told him and the other four people in the car that she had been raped. She pleaded with Lopez to drive her to a police station. Because the car was full of people, Doe found herself sitting on the lap of one of Cristo's passengers. Lopez testified that Doe was wearing a tank top, bra, and panties when she got in the car. Lopez drove her to a police station.

Doe told Officer Michael Gomez of the Riverside Police Department what happened to her, including the fact that Johnson drove her to a park and forced her to have sexual intercourse and perform oral copulation with him before she managed to escape. Doe told Officer Gomez that she knew Johnson only as "Nico" or "Devil" and that she did not know his last name.

In February 2012 Detective Phillip Fernandez of the Riverside Police Department received information that led the police to Johnson as a suspect in this case. Through his investigation, Detective Fernandez located Doe in North Carolina and interviewed her about the September 2010 sexual assault incident. When he showed Doe a photographic lineup, she chose Johnson's picture and identified him as the person who sexually assaulted her.

7

B. *Defense Case*

1. *Evidence*

Detective Fernandez was the sole witness called by the defense. He indicated that when he interviewed Doe in North Carolina, he asked her whether Johnson physically restrained her when she was in the backseat of his car. Detective Fernandez testified that Doe never told him she was restrained there.

2. *Closing argument*

During his closing argument defense counsel urged the jury to find Johnson not guilty of all charges because the evidence showed Doe consented to engaging in sex acts with him. Counsel argued that Johnson did not rape Doe in his car because she was wearing underwear when she got out of Johnson's car, as shown by Lopez's testimony that she was wearing panties when she jumped into Lopez's car. Defense counsel suggested that it did not make sense that Doe would put on her underwear and then jump out of Johnson's car, and he told the jury that Doe made up the story that Johnson raped her "because if she didn't make up that story, she would be naked from the waist down."

Defense counsel also argued that Doe liked being with Johnson as demonstrated by the fact that she drove around with him for five hours prior to his allegedly raping her, that she did not try to escape when she got out of his car to walk to a nearby public restroom, and that she did not try to escape from Johnson's car when Johnson stopped the car at traffic lights. Counsel also told the jury that for two years Doe did not report to the police that Johnson raped her. Counsel further argued that if Doe had been raped, the prosecution would have presented evidence that she suffered bruising.

8

DISCUSSION

## I. *GANG EVIDENCE*

Johnson first contends the judgment must be reversed because the court abused its discretion and violated his constitutional due process right to a fair trial by allowing the prosecution to introduce irrelevant and unduly prejudicial evidence of his gang affiliation and tattoos. We reject this contention.

### A. *Background*

#### 1. *The People's in limine motion and the court's ruling*

The People brought a motion in limine asking the court to allow the introduction of evidence that Johnson told Doe he was a member of an unspecified set of the Crips criminal street gang, that his gang moniker was "Devil," and that Doe saw several tattoos, including the number "120," on Johnson's body. The prosecutor argued the evidence was relevant to the issue of identity, and it was relevant both to establish that Johnson committed the charged crimes through the use of force and fear, and to explain why Doe feared that he was armed with a gun during the commission of the crimes. The prosecutor also argued the evidence that Doe saw the tattoos was relevant to the issues of her perception and credibility. Defense counsel informed the court that the defense was not contesting identity, and objected to the introduction of this evidence on the grounds that it was not relevant.

Observing there were no gang allegations in the case, the court indicated it was "inclined to let it in," but stated, "If [Doe] says, 'hey, he told me all of this stuff and it didn't scare me at all,' then I'm going to exclude it."

9

Defense counsel confirmed that Johnson's defense was that Doe consented to engage in the charged sexual acts. Following further argument, the court tentatively ruled that, because the case did not involve gang crimes, the evidence concerning Johnson's gang statement to Doe and his gang tattoos was not admissible to show he was a gang member, but the gang evidence was admissible to show the impact, if any, of the gang statement and tattoos on her "as it relate[d] to her fear."

The court and the parties agreed that an evidentiary hearing under Evidence Code section 402 should be conducted to determine the admissibility of Doe's testimony that Johnson told her he was affiliated with the Crips.

a. *Evidence Code section 402 hearing*: *Doe's testimony*

During the Evidence Code section 402 hearing, which was conducted outside the presence of the jury, Doe testified about the circumstances leading to her accusation that Johnson sexually assaulted her. She testified that when she was with Johnson on September 24, 2010, she saw several tattoos on his body, including the tattoo "120." Although they did not specifically discuss what all the tattoos meant, Johnson "told [her] something" about his being, or having been, a Crip member. Doe testified that he told her the "120" tattoo had something to do with his gang membership, but she "[could not] remember exactly what." The following exchange then took place between the prosecutor and Doe:

> "[Prosecutor]: Later on that evening, when the two of you were in Fairmont Park, did the conversation that you had with the defendant about him being a gang member, the tattoos that you saw, things like that, did that cause you to be afraid during—later on during the evening?

"[Doe]: No. But I don't—there wasn't like—I don't think that conversation was at the park. I mean, he just told me *that was pretty much a part of him was* [*sic*] *in his past*. [¶] . . .

"[Prosecutor]: Okay. While you were at Fairmount Park, you told the police that you were sexually assaulted, that you were raped there; right?

"[Doe]: Yes.

[Prosecutor]: During that incident, were you scared of the defendant?

"[Doe]: Yes.

"[Prosecutor]: Okay. Was the fact that you—as far as you knew, he was a gang member, was that part of what caused you to be afraid of him?

"[Defense counsel]: Misstates the testimony. She said 'was or is.' She didn't say he is a gang member. She said—

"[The Court]: Sustained. [¶] You can rephrase . . . .

[Prosecutor]: *Was the fact that the defendant talked to you about gang membership being a part of his life at some point, did that cause you to be afraid*?

"[Doe]: *No. Not really, no.*

[Prosecutor]: Okay. *Did that cause you to be scared that he had any weapons or anything like that*?

"[Doe]: *Oh, yes*. I would—okay. Yeah, like were [*sic*] thinking all that at the time and stuff, *I thought he probably did have a gun.*

"[Prosecutor]: *And why did you think—what made you think that he probably had a gun*?

"[Doe]: *His past, and the way he was acting*, and what had been going on that day with us." (Italics added.)

11

b. *Court's ruling*

After Doe finished testifying, the prosecutor argued the gang evidence should be admitted, stating:

> "[F]irst of all, dealing with the issue of the tattoos. Based on her testimony, what I would be asking to be allowed to get into is the fact that she did see tattoos on him, the 120 tattoos specifically that she discussed; and the fact that [Johnson] said that it had something to do with his gang membership.
>
> "I think it's relevant to the issue of fear, specifically the fact that later on during the [Evidence Code section 402 hearing], she testified that s*he thought that he probably had a weapon because of his gang membership, his past*. And it's all part and parcel of the issue of force or fear." (Italics added.)

In response, defense counsel argued the court should exclude Doe's statements concerning Johnson's gang membership and her belief he had a gun, but if the court was not going to exclude the evidence, the jury should be given a limiting instruction that the evidence was only admissible to show its effect upon Doe.

After listening to Doe's testimony and the arguments of both counsel, the court ruled that the prosecutor could not introduce any evidence at trial that Johnson was a gang member because the case did not involve any gang allegations. However, the court also ruled the prosecutor could question Doe both about Johnson's statement to her that his tattoos were related to his being a gang member, about her belief that he was armed with a gun because she believed gang members carry guns. The court then indicated that, before Doe testified about Johnson's statement to her regarding his tattoos and about his being a gang member, it would admonish the jury that it could only consider her

12

testimony about his tattoo and gang membership for the limited purpose of determining the effect, if any, of Johnson's gang statement on Doe, and not for the truth of the matter.

2. *Doe's trial testimony*

During direct examination at trial, the prosecutor questioned Doe about a conversation she had with Johnson when they were getting to know each other. As pertinent here, Doe testified, "That's when he told me about his Snoop Dog things, the gang affiliation—I don't know if it was currently or in the past." During that conversation Johnson made it clear he wanted to date Doe, but she made it clear to me she did not want to date him.

The following exchange between the prosecutor and Doe then took place regarding Johnson's tattoos and gang affiliation:

> "[Prosecutor]: Did you notice anything about [Johnson], anything on his body that you guys talked about?
>
> "[Doe]: Just the tattoos.
>
> "[Prosecutor]: Okay. What tattoos did you see?
>
> "[Doe]: I don't remember what they were. I just know that he had tattoos.
>
> "[Prosecutor]: Do you remember seeing any tattoos of numbers?
>
> "[Doe]: Yes. I saw '120' somewheres [*sic*]. And that's the reason why I remember 120[, too,] because he talked about it, some kind of affiliation with 120. I guess it's a street, but I don't know if it's something [that] has to do with a gang or something like that.
>
> "[Prosecutor]: Okay. You . . . mentioned something about a gang. Did you guys talk about gangs at all?
>
> "[Doe]: He told me that he was affiliated with Crips."

13

At that point the court interrupted the proceeding and admonished the jury it was not to consider Johnson's statement as proof he belonged to a gang. Specifically, the court told the jury:

> ""Ladies and gentlemen, that testimony is coming in not for the truth that that's actually true, but to show the impact of the effect on the listener in this case, the witness."

Later, when the court instructed the jury on the law after the parties rested and gave their closing arguments, it instructed the jurors under CALCRIM No. 303 that certain evidence was admitted during trial for a limited purpose and the jury was to continue to consider that evidence only for that limited purpose.

B. *Applicable Legal Principles*

1. *Evidence Code sections 1101 and 352*

Evidence Code section 1101, subdivision (a),[4] "prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393.) However, subdivision (b) of that section (hereafter Evidence Code section 1101(b))[5] "clarifies . . . that this rule does not prohibit

---

[4]     With exceptions not applicable here, Evidence Code section 1101, subdivision (a), provides that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

[5]     Evidence Code section 1101(b) provides that nothing in that section "prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when

14

admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*Ewoldt*, at p. 393, fn. omitted.)

If the trial court determines that uncharged misconduct is admissible under Evidence Code section 1101(b), it must then determine under Evidence Code section 352 whether the probative value of the evidence is "'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'" (*Ewoldt*, *supra*, 7 Cal.4th at p. 404, quoting Evid. Code, § 352.[6])

"The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352,

---

relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act."

[6] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"prejudicial" is not synonymous with "damaging."'" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

2. *Admissibility of gang membership evidence*

"[A]dmission of evidence of a criminal defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged." (*People v. Williams* (1997) 16 Cal.4th 153, 193.) The California Supreme Court has explained that in cases not involving a gang enhancement, "evidence of gang membership . . . should not be admitted if its probative value is *minimal*." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*), italics added.) Thus, "[g]ang evidence should not be admitted at trial where its *sole* relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense." (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449, italics added; Evid. Code, § 1101, subd. (a).)

However, the California Supreme Court has also explained that "evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*Hernandez*, *supra*, 33 Cal.4th at p. 1049.) Thus, "[g]ang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than

16

probative, and is not cumulative." (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192 (*Avitia*); Evid. Code, § 352.)

   3. *Standards of review*

The decision whether gang evidence is relevant, not unduly prejudicial, and thus admissible rests within the broad discretion of the trial court. (*Avitia*, *supra*, 127 Cal.App.4th at p. 193.)

We review the trial court's rulings under Evidence Code sections 1101 and 352 for an abuse of discretion. (*People v. Lewis* (2001) 25 Cal.4th 610, 637.) Thus, we review a trial court's decision to admit gang evidence for an abuse of discretion. (*Lewis*, *supra*, 25 Cal.4th at p. 637; *Avitia*, 127 Cal.App.4th at p. 193.)

"[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered." (*People v. Giminez* (1975) 14 Cal.3d 68, 72.) We will not disturb the trial court's exercise of discretion except upon a showing that it "exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

Where, as here, a party challenges a judgment on the ground the trial court erroneously admitted evidence over an objection based on the rules of evidence, we may reverse the judgment only if the error "resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13; Evid. Code, § 353, subd. (b).) We apply the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818 to determine whether an erroneous admission of evidence resulted in a miscarriage of justice requiring reversal of the

17

judgment. (*People v. Duarte* (2000) 24 Cal.4th 603.) Under the *Watson* standard, such error is reversible "only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." (*Watson*, at p. 836.)

C. *Analysis*

We reject Johnson's contention that the court abused its discretion and violated his constitutional right to a fair trial by admitting Doe's testimony that he spoke to her about his Crips gang affiliation and tattoos, because this evidence was relevant within the meaning of Evidence Code section 1101(b), and it was not unduly prejudicial for purposes of Evidence Code section 352.

Johnson was charged in this case with forcible rape (§ 261(a)(2)) and forcible oral copulation (§ 288a(c)(2)). With respect to the charge of forcible rape, the court instructed the jury under CALCRIM No. 1000 that to prove Johnson was guilty of this offense, the People were required to prove (among other things) that Doe did not consent to the sexual intercourse, and that Johnson "accomplished the intercourse by . . . fear of immediate and unlawful bodily injury to [her]." The court also instructed that "[i]ntercourse is accomplished by fear if the woman is actually and reasonably afraid or she is actually but unreasonably afraid and the defendant knows of her fear and takes advantage of it." The court further instructed that Johnson was "not guilty of rape if he

18

actually and reasonably believed that [Doe] consented to the intercourse and actually and reasonably believed that she consented throughout the act of intercourse."

With respect to the charge of forcible oral copulation, the court instructed the jury under CALCRIM No. 1015 that to prove Johnson was guilty of this offense, the People were required to prove (among other things) that Doe did not consent to the act of oral copulation and that Johnson "accomplished the act by . . . fear of immediate and unlawful bodily injury to [her]." The court also instructed that "[a]n act is accomplished by fear if the other person is actually and reasonably afraid or she is actually and unreasonably afraid and the defendant knows of her fear and takes advantage of it." The court further instructed that Johnson was "not guilty of forcible oral copulation if he . . . actually and reasonably believed that [Doe] consented to the act."

Johnson did not dispute that he and Doe engaged in sexual intercourse and acts of oral copulation. His defense at trial was that Doe consented to engage in the sexual acts.

The challenged gang evidence─Doe's testimony about Johnson's statements to her regarding his Crips gang affiliation and tattoos─was relevant within the meaning of Evidence Code section 1101(b) because it bore on the critical issue of Doe's credibility and the jury's assessment of her testimony (discussed more fully, *ante*, in the factual background) that she was "scared" of Johnson, she felt she "didn't have a choice," and she submitted to his demand that she engage in the sexual acts because of his "past," which the jury reasonably could interpret as a reference to his current or past affiliation with the Crips gang.

19

The California Supreme Court's decision in *People v. Mendoza* (2000) 24 Cal.4th 130 (*Mendoza*), is instructive. In *Mendoza*, the kidnapping and robbery victim testified the defendant said he was a "homeboy" and understood that term to mean he was a member of a gang. (*Id*. at p. 163.) The defense objected to the victim's testimony on the ground it was immaterial, and the trial court overruled the objection on the ground the victim's testimony was relevant to show that the victim's state of mind was that of fear at the time the offenses were committed. (*Ibid*.) The *Mendoza* court upheld the trial court's ruling, explaining that "[t]he prosecution's questions and [the victim's] answers were directly relevant to establishing the element of fear." (*Id*. at p. 178.)

Similarly here, Doe's testimony about Johnson's statements to her regarding his Crips gang affiliation and tattoos was "directly relevant to establishing the element of fear." (*Mendoza*, *supra*, 24 Cal.4th at p. 178.)

Johnson asserts the evidence of his "purported statements to Doe concerning his gang affiliations and tattoos" was not relevant "to prove that Doe was afraid of [him] and, hence, that the [charged offenses were] committed through the use of force or fear" because, "when questioned during the [Evidence Code section] 402 hearing, Doe categorically denied that her fear of [him] was based on his tattoos or his statements that he had been in a gang." As previously discussed, the prosecutor asked Doe during that hearing, "Was the fact that the defendant talked to you about gang membership being a part of his life at some point, did that cause you to be afraid?" Johnson apparently relies on Doe's response, "No. Not really, no." However, Johnson disregards the exchange between the prosecutor and Doe that immediately followed:

20

[Prosecutor]: Okay. *Did that cause you to be scared that he had any weapons or anything like that?*

"[Doe]: *Oh, yes.* I would—okay. Yeah, like were [*sic*] thinking all that at the time and stuff, *I thought he probably did have a gun.*

"[Prosecutor]: *And why did you think—what made you think that he probably had a gun?*

"[Doe]: *His past*, and the way he was acting, and what had been going on that day with us." (Italics added.)

After Doe finished testifying, the prosecutor argued the gang evidence should be admitted, indicating that Doe's reference to Johnson's "past" was a reference to his gang membership:

"I think it's relevant to the issue of fear, specifically the fact that later on during the [Evidence Code section 402 hearing], she testified that s*he thought that he probably had a weapon because of his gang membership, his past.* And it's all part and parcel of the issue of force or fear." (Italics added.)

These excerpts show that, when Doe mentioned Johnson's "past" in response to the prosecutor's question about what made her think that Johnson had a gun, she was referring to his gang affiliation. Thus, we conclude the record does not support Johnson's claim that Doe "categorically denied" during the Evidence Code section 402 hearing that "her fear of [him] was based on his tattoos or his statements that he had been in a gang."

We also conclude the challenged gang evidence was not unduly prejudicial for purposes of Evidence Code section 352. As noted, the court gave a limiting instruction,[7]

---

7    See footnote 3, *ante*.

21

requested by the defense,[8] admonishing the jury that it could consider Johnson's gang statement and his tattoos only to determine the effect it may have had on Doe. We presume jurors understand and follow a trial court's instructions. (*People v. Jackson* (2014) 58 Cal.4th 724, 767.) Accordingly, because we presume the jury followed the court's instructions and nothing in the record shows otherwise, we conclude the jurors followed the court's limiting instruction with regard to the challenged gang evidence.

For all of the foregoing reasons, we conclude the court did not err or deny Johnson a fair trial by admitting the highly probative gang evidence.

## II. *DENIAL OF JOHNSON'S NEW TRIAL MOTION*

Johnson next contends the judgment must be reversed because the court abused its discretion and violated his federal constitutional rights to due process and effective assistance of counsel by denying his motion for a new trial, which he brought in propria persona based on his claim that his trial counsel provided ineffective assistance by refusing to allow him to testify in his own behalf and by failing to advise him of his right to do so. We reject this contention.

A. *Background*

1. *Johnson's opposed new trial motion*

After the jury returned their guilty verdicts, Johnson, representing himself, filed a motion for new trial. As pertinent here, Johnson asserted his trial counsel, Darryl Exum,

---

8     Following Doe's testimony at the Evidence Code section 402 hearing, and after the court ruled it would admit the gang evidence, defense counsel requested that the court "give . . . , at a minimum, a limiting instruction, because that's not coming in for the truth. It's only coming in to say that she believed it, and it made her feel in fear."

22

provided ineffective assistance by "refus[ing] to allow [him] to testify in his own behalf," and by "willfully and with intent fail[ing] to advise [him] of [his] rights as a defendant to take the stand in [his] own behalf."

In its opposition, the prosecution argued that the record demonstrated that Exum was "extremely well prepared for trial," Exum vigorously cross-examined the witnesses and pointed out a number of discrepancies in Doe's testimony, he presented evidence to support the defense theory that the sexual encounter between Doe and Johnson was consensual, and he "gave a powerful closing argument which attacked several aspects of the People's case."

The prosecution also argued that Johnson was aware of his right to testify during the trial because a recording of his telephone call from jail to his wife on September 24, 2014—the day before the People rested their case-in-chief—showed Johnson asked his wife whether she thought he should testify, and she advised him she thought he should not testify because his testifying would open the door to evidence regarding his criminal history. In support of this argument, the prosecution attached a copy of the transcript of the jail call, which shows the following exchange occurred between Johnson and his wife:

> "JOHNSON: Ok, well look, tomorrow is my last day, should I take the stand or not?
>
> "[JOHNSON'S] WIFE: I don't think so, because that opens up your background baby[.]
>
> "JOHNSON: Alright."

23

In his written reply to the People's opposition, Johnson stated that "in [his] own defense it was decided that he would take the stand."  Regarding his telephonic conversation from jail with his wife, Johnson acknowledged that "[t]he People include[d] a conversation between the defendant and his wife, the question asked and the answer given."  He then stated that "in the time that [he] ha[d] been incarcerated, there ha[d] been numerous questions asked, and answers given, in reference, the ideal of Mr. Johnson going pro per."  In his reply, Johnson did not deny that he accepted his wife's advice that he not testify.

   a. *Hearing and ruling on Johnson's new trial motion*

At the hearing on Johnson's new trial motion, and in response to Johnson's and the prosecutor's questions about manner in which the hearing would be conducted and whether Exum would be placed under oath, the court said it would receive and consider statements from Johnson and Exum pertaining to Johnson's claims without placing either of them under oath.  Johnson did not object to the manner of conducting the hearing proposed by the court.

Addressing Exum, the court said, "[Johnson] claims that you failed to allow him to testify.  [S]o I want to ask you what your discussions were with him and in regards to that."  In response, Exum indicated he told Johnson he had an absolute right to testify, but he strongly advised Johnson not to testify:

> "I explained to him that he has an absolute right to testify; however, my opinion, and I strongly worded my opinion to him, was that he should not testify.  It would be against his best interest.  And I cited to him the priors that we talked about in court in the [Evidence Code section] 402 hearings, that would be the one that was, I believe,

24

mayhem, attempted murder, or either attempted manslaughter or something along those lines. And also there was a charge of making threats against the [P]resident. And there was a drug charge, which we didn't litigate."

Exum also told the court:

"[I]n this case one of the allegations from the victim was that [Johnson] had a gun. And in the case where he had a prior, he had a gun. And I didn't think that we could unring that bell. So my advice to him was that [he] should not testify in this case. [¶] And I will also tell the Court, and I'm sure Mr. Johnson will tell you, I did lean over and tell him you should not testify. The case has gone as well as it could go."

The judge then asked Exum how Johnson responded to his advice not to testify, and Exum responded:

"Well, when I spoke to him and explained that he had an absolute right to testify, he acknowledged and understood that he did tell me [*sic*] that he wanted to testify. I explained to him why he shouldn't testify. I mean, it was, you know, I explained to him you shouldn't testify for these reasons, and if you testify, I believe that this case is going to be a lot worse. So having done this many times, your Honor I made it clear. You have an absolute right to testify. And I will tell you that Mr. Johnson understood that to the extent that he explained that to me earlier before that, that he could testify if he wanted to. So I know that he understood that part. But I will let the Court know, I did in no uncertain terms advise him not to testify, strongly."

The court then asked Exum whether it was his understanding, based on his discussions with Johnson, that Johnson had made a decision to not testify. Exum replied:

"Yes. As I said when I leaned over to him and said you're not going to testify, that was shortly before the case concluded."

25

When the court pressed him further, Exum stated that Johnson was "going to follow [his] recommendation" that he not testify.

The court then asked Johnson, "[W]hat prevented you from telling me right then and there that you wanted to testify?" Johnson replied, "Honestly, your Honor, *I didn't know I had the right to*." (Italics added.) The court commented in response, "You spoke up quite a bit throughout the trial, Mr. Johnson." After indicating he had argued with his counsel during the trial, Johnson stated:

> "[Exum] came to the jail and saw me one time and explained that to me about how he felt that it wasn't a good idea and all of that. Despite that, there is no other defense other than my testimony and I told him that. Nobody knows what happened that night but me and [Doe]. Nobody can tell what happened that night but me and her. I want to take the stand in my own defense. He never leaned over here and said, 'I don't think you should testify.' He simply rested the case."

The court invited the prosecutor to comment, and the prosecutor, referring to the transcript of Johnson's telephone call to his wife from jail, stated:

> "[Johnson] very clearly indicates by his question to his wife that he was well aware of his right to testify and that it was his decision. He flat-out asks her."

The prosecutor added, "So I think it's at best disingenuous for [Johnson] to now claim that [the decision about whether he would testify] was not his decision or that . . . he was unaware that it was his decision."

Later during the hearing, Johnson told the court:

> "The only other thing I can say, Your Honor, is like I ain't [*sic*] never said I didn't want to testify. My plan was to testify. There is no other defense. We never had a plan of defense. He never discussed with me what he was going to do, how he was going to do it."

26

i. *Ruling*

Following further discussion, the court denied Johnson's new trial motion. Noting that Exum "did everything he could to impeach [Doe]," the court found that no credible evidence had been presented to show that Exum failed to perform with reasonable diligence. The court also found that even if Exum's performance had been deficient, there was no showing Johnson would have received a more favorable outcome in the absence of such deficient performance.

B. *Applicable legal principles*

1. *Right to testify*

A defendant in a criminal case has a constitutional right to testify in his own defense even over the advice of counsel. (*Rock v. Arkansas* (1987) 483 U.S. 44, 51-53; *People v. Johnson* (1998) 62 Cal.App.4th 608, 617-618.)

2. *Ineffective assistance of counsel*

As noted, Johnson's new trial motion was based on his claim that his trial counsel provided ineffective assistance. The law governing Johnson's ineffective-assistance-of-counsel claim is settled. A criminal defendant is constitutionally entitled to effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 684-685 (*Strickland*); *People v. Frye* (1998) 18 Cal.4th 894, 979 (*Frye*).) To establish a denial of the right to effective assistance of counsel, a defendant must show (1) his counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance

27

prejudiced the defendant.  (*Strickland*, at pp. 687, 691-692; *Frye*, at p. 979.)  To demonstrate prejudice, a defendant asserting an ineffectiveness claim on appeal must show a reasonable probability he or she would have received a more favorable result had counsel's performance not been deficient.  (*Strickland*, at pp. 693-694; *Frye*, at p. 979.)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  (*Strickland*, at p. 694.)

*Strickland* explained that "[j]udicial scrutiny of counsel's performance must be highly deferential [because] [i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."  (*Strickland*, *supra*, 466 U.S. at p. 689.)  *Strickland* also explained that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (*Ibid*.)

3.  *Standard of review*

A trial court has broad discretion in ruling on a motion for new trial motion. (*People v. Ault* (2004) 33 Cal.4th 1250, 1260.)  We review a trial court's ruling on a new trial motion under a deferential abuse-of-discretion standard, and we will not disturb that ruling absent a manifest and unmistakable abuse of the trial court's discretion.  (*People v. Lightsey* (2012) 54 Cal.4th 668, 729 (*Lightsey*).)  We defer to the trial court's express or

28

implied findings of fact if they are supported by substantial evidence. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724 (*Taylor*).)

C. *Analysis*

Johnson has failed to meet his burden of showing the court's denial of his new trial motion was a manifest and unmistakable abuse of the court's broad discretion. (See *Lightsey*, supra, 54 Cal.4th at p. 729.) As noted, Johnson's motion was based on his claim that his trial counsel, Exum, provided ineffective assistance by refusing to allow him to testify in his own behalf and by failing to advise him of his right to do so.

In denying Johnson's new trial motion, the court found that no credible evidence had been presented to show that Exum's performance was deficient. In reviewing the court's denial of Johnson's new trial motion, we defer to the court's express or implied findings of fact if they are supported by substantial evidence. (*Taylor*, *supra*, 162 Cal.App.3d at p. 724.)

Here, substantial evidence supports the court's implied factual findings that Exum advised Johnson of his right to testify and that Johnson agreed with Exum's and Johnson's wife's advice that he not testify in order to prevent the prosecutor from cross-examining him about his criminal history. Specifically, Exum told the court he explained to Johnson that he had the absolute right to testify, but he strongly advised Johnson he should not testify because Johnson previously had been convicted of attempted first degree murder, mayhem, and voluntary manslaughter. As discussed, *ante*, the prosecutor presented the transcript of Johnson's recorded telephonic conversation with his wife the day before the People rested their case-in-chief, which showed that Johnson asked for his wife's opinion

29

about whether he should testify in his own defense, she told he should not testify "because that opens up your background baby," and Johnson replied, "Alright." This conversation with his wife clearly shows Johnson was well aware of his right to testify. It also shows he agreed with his wife's advice that he not testify. The foregoing evidence belies both Johnson's claim that Exum never advised him he had the right to testify in his own defense, and his claim that Exum prevented him from testifying. We affirm the court's implied findings and conclude the court did not abuse its broad discretion because those findings are supported by substantial evidence. (*Taylor*, *supra*, 162 Cal.App.3d at p. 724.)

Johnson asserts, however, that in two respects "the manner in which the trial court conducted the hearing on his motion for a new trial deprived him of due process of law in that it failed to afford him the procedural protections of a *Marsden*[9] proceeding or the constitutional rights applicable to a hearing on a motion for new trial." First, he asserts the prosecutor should have been excluded from the courtroom because "the prosecutor's presence necessarily had a chilling effect upon [his (Johnson's)] ability to adequately present his argument in support of his motion for a new trial." This assertion is

---

[9]     *People v. Marsden* (1970) 2 Cal.3d 118. When a trial court learns that a defendant in a criminal case is seeking to discharge court-appointed counsel and is requesting the appointment of a substitute attorney based on a contention that current counsel has provided inadequate representation, the court must hold a hearing on what the courts have referred to as a "*Marsden* motion" to permit the defendant to explain the basis of his or her contention and to relate specific instances of the attorney's alleged inadequate performance to allow the court to decide whether to grant the defendant's request. (*People v. Sanchez* (2011) 53 Cal.4th 80, 87.)

unavailing because Johnson makes no showing of what argument he would have made in support of his claims of ineffective assistance of counsel had the prosecutor been excluded from the courtroom during the hearing.

Second, Johnson contends he was "deprived . . . of due process of law" because Exum "[was not] sworn to tell the truth before [he was] questioned by the judge." He cites sections 1878 and 2094 of the Code of Civil Procedure and *Marlow v. Orange County Human Services Agency* (1980) 110 Cal.App.3d 290 (*Marlow*) for the proposition that "a motion for a new trial is a part of the trial" and, thus, "witnesses testifying at a hearing on the motion for a new trial must be sworn to tell the truth."

We reject Johnson's contention. His reliance on the foregoing legal authorities is unavailing because they do not support the proposition for which they are cited. Code of Civil Procedure section 1878 merely defines the term "witness."[10] This section does not require that a person questioned by a trial court at a hearing on a new trial motion in a criminal case be administered an oath. Code of Civil Procedure section 2094 is inapposite because it merely governs the manner of administering an oath.[11] *Marlow* is

---

[10]    Code of Civil Procedure section 1878 provides: "A witness is a person whose declaration under oath is received as evidence for any purpose, whether such declaration be made on oral examination, or by deposition or affidavit."

[11]    Code of Civil Procedure section 2094 provides: "(a) An oath, affirmation, or declaration in an action or a proceeding, may be administered by obtaining an affirmative response to one of the following questions: [¶] (1) 'Do you solemnly state that the evidence you shall give in this issue (or matter) shall be the truth, the whole truth, and nothing but the truth, so help you God?' [¶] (2) 'Do you solemnly state, under penalty of perjury, that the evidence that you shall give in this issue (or matter) shall be the truth, the whole truth, and nothing but the truth?' [¶] (b) In the alternative to the forms prescribed

31

inapposite because it was a civil case that did not involve a new trial motion; it involved an administrative agency's failure to examine witnesses under oath in violation of the requirement under the California Administrative Code that testimony taken in such proceedings be taken under oath. (*Marlow*, *supra*, 110 Cal.App.3d at pp. 292-294.)

In any event, when the court informed Johnson and the prosecutor at the commencement of the hearing that it would receive and consider statements from Johnson and Exum pertaining to Johnson's claims without placing either of them under oath, Johnson did not object and thereby forfeited any claim of impropriety or constitutional error. In *People v. McCullough* (2013) 56 Cal.4th 589, 593, the California Supreme Court explained that, as it had "observed on numerous occasions, '"a constitutional right,' or a right of any other sort, 'may be forfeited in criminal . . . cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it."'" [Citation.] 'Ordinarily, a criminal defendant who does not challenge an assertedly erroneous ruling of the trial court in that court has forfeited his or her right to raise the claim on appeal.' [Citation.] '"The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. [Citation.]"' [Citation.] Additionally, '[i]t is both unfair and

---

in subdivision (a), the court may administer an oath, affirmation, or declaration in an action or a proceeding in a manner that is calculated to awaken the person's conscience and impress the person's mind with the duty to tell the truth. The court shall satisfy itself that the person testifying understands that his or her testimony is being given under penalty of perjury."

inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided.'"

Johnson is also estopped from claiming error because he, too, answered the court's question without having taken an oath to tell the truth. The transcript of his telephone call to his wife from jail before the People rested their case at trial, showing he asked his wife whether he should testify, strongly suggests he did not tell the truth at the hearing on his new trial motion when he told the court that, when the People rested their case, he did not know that he had the right to testify.

For all of the foregoing reasons, we conclude the court did not abuse its discretion or violate Johnson's constitutional right to due process.

III. *COURT'S FAILURE TO SUA SPONTE GIVE A UNANIMITY INSTRUCTION*

Johnson also contends his count 2 conviction of forcible oral copulation must be reversed because the court erroneously failed to sua sponte give a unanimity instruction under CALCRIM No. 3500. We reject this contention.

A. *Background*

As discussed fully, *post*, Doe testified about two acts of forcible oral copulation that occurred at "around the same time."

Before the prosecution rested its case and outside the presence of the jury, the court, prosecutor, and defense counsel (Exum) discussed both off and on the record the instructions to be given to the jury. After noting it had approved the packet of jury

33

instructions, the court asked whether "there [were] any objections or comments counsel wanted to make with respect to the final packet." Both counsel replied they had none.

After the parties rested their cases, and after the prosecutor and Exum gave their closing arguments, the court instructed the jury on the applicable law. As pertinent here, the court instructed the jury under CALCRIM No. 3550: "Your verdicts must be unanimous. This means that, to return a verdict, all of you must agree to it." The court's instructions pertaining to the crime of oral copulation by force charged in count 2 stated in part:

> "The defendant is charged in Count 2 with oral copulation by force in violation of Penal Code Section 288a.
>
> "To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed an act of oral copulation with someone else; [¶] 2. The other person did not consent to the act; [¶] AND [¶] 3. The defendant accomplished the act by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to someone.
>
> "Oral copulation is any contact, no matter how slight, between the mouth of one person and the sexual organ or anus of another person. Penetration is not required."

The court did not give a separate unanimity instruction under CALCRIM No. 3500.

B. *Applicable legal principles*

"[T]he requirement of jury unanimity in criminal cases is of constitutional origin." (*People v. Jones* (1990) 51 Cal.3d 294, 321, citing Cal. Const., art. I, § 16.) As this court explained in *People v. Muniz* (1989) 213 Cal.App.3d 1508, 1517, "[i]t is well established

34

that the entire jury must agree upon the commission of the same act in order to convict a defendant of the charged offense."

As a general rule, "[w]hen an accusatory pleading charges the defendant with a single criminal act, and the evidence presented at trial tends to show more than one such unlawful act, either the prosecution must elect the specific act relied upon to prove the charge to the jury, or the court must instruct the jury that it must unanimously agree that the defendant committed the same specific criminal act." (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534.) "The duty to instruct on unanimity when no election has been made rests upon the court sua sponte." (*Ibid.*)

However, under the "continuous conduct" rule, a unanimity instruction is not required when "the acts alleged are so closely connected as to form part of one transaction" or "the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them." (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100 (*Stankewitz*).) "Neither an election nor a unanimity instruction is required when the crime falls within the 'continuous conduct' exception." (*People v. Salvato* (1991) 234 Cal.App.3d 872, 882.)

"[P]roof of a course of conduct offense will usually consist of evidence of various incidents occurring over a period of time." (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1451.) "A continuous course of conduct, by its nature, may stop and start." (*People v. Rae* (2002) 102 Cal.App.4th 116, 124 (*Rae*).)

35

1. *Standard of review*

The propriety of a trial court's decision to give or refuse any particular instruction in a case involves a mixed question of law and fact that is a predominantly legal one that should be examined without deference. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.) Thus, "assertions of instructional error are reviewed de novo." (*People v. Shaw* (2002) 97 Cal.App.4th 833, 838, citing *Waidla*, *supra*, 22 Cal.4th at p. 733.)

C. *Analysis*

Johnson contends his count 2 conviction of forcible oral copulation must be reversed because (1) Doe testified about two separate acts of oral copulation—Johnson's forcing her to orally copulate him and his orally copulating her by force—which could have supported his count 2 conviction, and (2) the court erroneously failed to sua sponte give the jury a unanimity instruction under CALCRIM No. 3500.[12] Thus, he asserts, the court's "failure to give [a] unanimity instruction lessened the People's burden of proof on the elements [of count 2] by permitting the jury to reach a guilty verdict without agreeing, beyond a reasonable doubt, that [he] committed a specific criminal act which constituted proof of each element."

We conclude the court did not err in failing to give sua sponte a unanimity instruction as to count 2, and thus it did not lessen the prosecution's burden of proof,

---

[12]    Johnson asserts the court should have instructed the jury under CALCRIM No. 3500 as follows: "The defendant is charged with forcible oral copulation in Count 2, o[n] about September 25, 2010. The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed."

36

because Johnson's alleged acts of orally copulating Doe by force and forcing her to orally copulate him constituted a continuous course of conduct and, thus, a unanimity instruction with respect to that count was not legally required. As already discussed, under the "continuous conduct" rule a unanimity instruction is not required when the alleged acts are "so closely connected as to form part of one transaction" or "the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them." (*Stankewitz*, *supra*, 51 Cal.3d at p. 100.) By its nature, a continuous course of conduct may stop and start. (*Rae*, *supra*, 102 Cal.App.4th at p. 124.)

Here, Doe testified that when Johnson took his penis out of her vagina, he demanded that she suck his penis and she complied. The prosecutor asked Doe why she performed oral sex on Johnson, and she replied, "Because I just wanted to do whatever I had to do to get out and stay alive." Doe also testified that Johnson put his mouth on her vagina at "around the same time" she had to orally copulate him. The foregoing evidence shows the two acts of forcible oral copulation were so closely connected as to form part of one transaction. Thus, we conclude the court did not err by failing to give a unanimity instruction under CALCRIM No. 3500 because, under the continuous conduct rule, such an instruction was not required. (See *Stankewitz*, *supra*, 51 Cal.3d at p. 100.) Furthermore, during his closing argument, Johnson's counsel urged the jury to find Johnson not guilty of all charges because the evidence showed Doe consented to engaging in the sex acts with him. Thus, Johnson "offer[ed] essentially the same defense

37

to each of the acts, and there [was] no reasonable basis for the jury to distinguish between them." (*Stankewitz*, at p. 100.)  Accordingly, we affirm Johnson's conviction of count 2.

IV.  *SENTENCING*

Last, Johnson contends the court's refusal to grant his *Romero* motion, in which he asked the court to strike his 1991 strike convictions (voluntary manslaughter, attempted first degree murder, and mayhem), constituted an abuse of discretion and the resulting prison sentence violated the federal and state constitutional prohibitions against cruel or unusual punishment because (1) his prior strike offenses and his criminal history "place him outside the scope of the Three Strikes law," and (2) his sentence of 55 years to life in prison is a "de facto term of life without parole for an offense which amounted to date rape."  We reject these contentions.

A.  *Background*

Following a bifurcated bench trial, the court found to be true allegations that Johnson was convicted in 1991 of voluntary manslaughter (§ 192, subd. (a)), which qualified both as a serious felony prior conviction (§ 667, subd. (a)) and as a strike under the Three Strikes law (§§ 667, subds. (c) & (e)(2)(A), 1170.12, subds. (c)(2)(A)) and that he also was convicted in 1991 of attempted first degree murder (§§ 187, subd. (a), 664), and mayhem (§ 203), which qualified as additional strikes under the Three Strikes law.

The court denied Johnson's pro per *Romero* motion to strike his three prior strikes. Finding Johnson did not fall outside the spirit of the Three Strikes law, the court stated:

> "Mr. Johnson, I truly don't think you fall outside of the three strikes
> law, sir.  I mean, the time span that I know you wrote down here that
> you were otherwise not in trouble, I think is not completely accurate.

38

I mean, I think at the most, at the very most, I think [the prosecutor] wrote four years. I'd say at the very most, you might have been out of trouble for eight [years]. You got out in 2002 and the allegations in this case, which have been found true by the jury, were from 2010. That's eight years. [T]hat's not somebody that I think is worthy of this court[']s granting a *Romero* motion.

"The things I kind of look at would have been, you know, 20-year span. There's no magic number to put on that, but not only a large span of time, but somebody who has truly turned their life around, not for two years, not four years, but for a long time . . . . [¶] . . .

" [I]n ruling on the *Romero* motion, I look at the totality of everything, not only what you were convicted of in the past, but the nature of the strike in the present. And, again, whether you agree with [Doe] or not what she described and what this jury found true and convicted you of is an extremely serious charge, very violent charge, and not something that I think is cause for me to think that you fall outside of the three strikes law.

"When I couple that with the nature of the charges that you were convicted of [in 1991], again, you can claim as long as you want that, you know, you . . . just happened to be there and you happened to just take a deal for whatever reason because you didn't want to testify, you didn't want to rat out your friends, whatever the case was, the fact remains that you did take a deal, you did plead guilty to those charges, and you did a significant amount of time for them and they're all very serious."

The court also stated:

"[H]aving looked at the abstract and having no other evidence to the contrary, [I] believe that each of these strikes was committed against separate victims. Unless there was any other evidence to the contrary, I'm prepared to deny the motion as to all three strikes and not grant the *Romero* motion and not strike any of the strikes for the reasons I stated earlier. The only reason I was going to consider [striking] the mayhem is if it was determined it was the same victim as the [victim of] the attempted first-degree murder. I don't have any evidence to believe that it is. So that motion will be denied."

39

The court sentenced Johnson as a third strike offender to an indeterminate state prison term of 50 years to life, plus a consecutive determinate prison term of five years, for an aggregate sentence of 55 years to life.

B. *Applicable legal principles*

1. *Romero*

In *Romero*, *supra*, 13 Cal.4th at pages 504 and 529-530, the California Supreme Court held that section 1385, subdivision (a) (hereafter section 1385(a))[13] permits a court acting on its own motion and "'in furtherance of justice'" to strike prior felony conviction allegations in cases brought under the Three Strikes law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)). Although the Legislature has not defined the phrase "in furtherance of justice" contained in that subdivision, the California Supreme Court has held that this language requires a court to consider both the "'"constitutional rights of the defendant, and the interests of society represented by the People"'" (italics omitted) in determining whether to strike a prior felony conviction allegation. (*Romero*, at p. 530.)

In *People v. Williams* (1998) 17 Cal.4th 148, the California Supreme Court explained that, in determining whether to strike or vacate a prior strike allegation or finding under the Three Strikes law "in furtherance of justice" pursuant to section 1385(a), the trial court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the

---

13      Section 1385(a) provides in part that a trial court "may, either of [its] own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed. The reasons for the dismissal shall be stated orally on the record. The court shall also set forth the reasons in an order entered upon the minutes."

40

particulars of his background, character, and prospects, the defendant may be deemed outside the [Three Strikes law's] spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams*, at p. 161.)

In *People v. Carmony* (2004) 33 Cal.4th 367, 371 (*Carmony*), our high state court held that a trial court's decision not to dismiss a prior strike conviction allegation under section 1385(a) is reviewed under the deferential abuse of discretion standard. (*Carmony*, at p. 376.) *Carmony* explained that "a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id*. at p. 377.)

2. *Cruel or unusual punishment*

"The Eighth Amendment [to the United States Constitution], which applies against the States by virtue of the Fourteenth Amendment . . . provides: 'Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.'" (*Harmelin v. Michigan* (1991) 501 U.S. 957, 962 (*Harmelin*).)

Under the Eighth Amendment, challenges to the length of a sentence are rarely granted. (*Solem v. Helm* (1983) 463 U.S. 277, 289-290 ["'[outside] the context of capital punishment, successful challenges to the proportionality of particular sentences [will be] exceedingly rare,'"(italics omitted)].) The United States Supreme Court has explained that reviewing courts "should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted

41

criminals." (*Id.* at p. 290, fn. omitted.)  The high court has also explained that "[t]he

Eighth Amendment does not require strict proportionality between crime and sentence.

Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime."

(*Harmelin*, *supra*, 501 U.S. at p. 1001.)

Sections 17 and 24 of article I of the California Constitution set forth the same

prohibition as that set forth in the Eighth Amendment.  Article I, section 17 provides:

"Cruel or unusual punishment may not be inflicted or excessive fines imposed."  Section

24 of that article mandates that California courts interpret the California cruel or unusual

punishment prohibition in a manner consistent with the federal Constitution.

The California Supreme Court has emphasized that a defendant must overcome a

"considerable burden" in challenging a penalty on the ground it constitutes cruel or

unusual punishment under the California Constitution.  (*People v. Wingo* (1975) 14

Cal.3d 169, 174.)  Our high court has stated that "[t]he doctrine of separation of powers is

firmly entrenched in the law of California, and a court should not lightly encroach on

matters which are uniquely in the domain of the Legislature.  Perhaps foremost among

these are the definition of crime and the determination of punishment."  (*Ibid.*; see *People

v. Dillon* (1983) 34 Cal.3d 441, 477 (*Dillon*).)

Ultimately, the test to be applied in California for determining whether a particular

punishment violates the California constitutional prohibition against cruel or unusual

punishment is whether, "'although not cruel or unusual in its method, it is so

disproportionate to the crime for which it is inflicted that it shocks the conscience and

offends fundamental notions of human dignity.'"  (*Dillon*, *supra*, 34 Cal.3d at p. 478, quoting *In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*).)

It is permissible to base the determination of whether the punishment constitutes cruel and unusual punishment solely on the nature of the current offenses and the offender.  (*People v. Ayon* (1996) 46 Cal.App.4th 385, 399, disapproved on another point in *People v. Deloza* (1998) 18 Cal.4th 585, 593, 600, fn. 10; *People v. Young* (1992) 11 Cal.App.4th 1299, 1308-1311; *People v. Weddle* (1991) 1 Cal.App.4th 1190, 1198-1200.)

C.  *Analysis*

1.  *Romero*

Applying the deferential abuse of discretion standard, as we must (*Carmony, supra*, 33 Cal.4th at p. 371), we conclude Johnson has failed to meet his burden on appeal of showing that the court's denial of his *Romero* motion was an abuse of discretion and that he should be deemed to be outside the spirit of the Three Strikes law.  The record shows the court considered the factors discussed in *People v. Williams*:  "[T]he nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects."  (*People v. Williams*, s*upra*, 17 Cal.4th at p. 161.)

Specifically, the record shows that when Johnson committed his current offenses (forcible rape and forcible oral copulation) in September 2010 he was over 39 years of age and he had a lengthy criminal record of about 24 years that began in 1986.  In mid-May 1986 he was committed to what then was known as the California Youth Authority

43

(CYA) for a drug possession offense. He was almost 18 years of age in November 1988 when he was paroled from his CYA commitment.

Johnson was almost 20 years old in late February 1991 when he pleaded guilty to three counts of attempted murder, one count of voluntary manslaughter, and one count of mayhem, for which he was sentenced to a prison term of 19 years four months. Johnson was 30 years old when he was released on parole in that case in early March 2001.

In late April 2001, about six weeks after he was released on parole, Johnson was arrested for threatening the President of the United States. He was convicted of that crime and sentenced to one year in federal custody plus three years of supervised release. He was 31 years old when he was released from federal custody in March 2002.

Following Johnson's March 2001 release on parole for his 1991 state prison convictions, he was returned to state prison custody in 2002 and 2003, and he was ultimately discharged from parole in August 2004 when he was 33 years of age.

From September 2006, when he was 35 years old, to September 2010 when—at age 39—he committed his current forcible sex offenses against Doe, Johnson was arrested, convicted, and incarcerated in numerous cases involving violations of the Health and Safety Code, Penal Code, and Vehicle Code.

The foregoing record of Johnson's criminal recidivism supports the court's finding that he falls within the spirit of the Three Strikes law. Johnson attempts to minimize the severity of his current convictions of forcibly raping Doe and forcing her to engage in oral copulation by asserting that these extremely serious sex crimes only "amounted to

44

date rape." We conclude the court did not abuse its broad discretion. Accordingly, we affirm the court's order denying Johnson's *Romero* motion.

2. *Johnson's claim that his sentence constitutes cruel or unusual punishment*

Johnson, who is now 45 years of age, claims his aggregate third-strike-offender sentence of 55 years to life violates the state and federal constitutional prohibitions against cruel or unusual punishment because it "deprives him of any hope for parole during his lifetime" and "is so out of proportion to his past criminal record and the facts of the current offense that it constitutes cruel and unusual punishment."

As discussed, *ante*, the Eighth Amendment to our federal Constitution "forbids . . . extreme sentences that are 'grossly disproportionate' to the crime" (*Harmelin*, *supra*, 501 U.S. at p. 1001), and the California Constitution prohibits sentences that are "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*Lynch*, *supra*, 8 Cal.3d at p. 424.)

Here, after considering the nature of both the current offenses (forcible rape and forcible oral copulation) and the offender (Johnson), we conclude Johnson's sentence does not violate the Eighth Amendment because it is not "'grossly disproportionate' to the crime" (*Harmelin*, *supra*, 501 U.S. at p. 1001), and it does not violate the California Constitution's prohibition of cruel or unusual punishment because it is not "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*Lynch*, *supra*, 8 Cal.3d at p. 424.) As noted, Johnson minimizes the severity of his current convictions by asserting that these extremely serious sex crimes only "amounted to date rape." His claim that he did not

45

physically harm Doe minimizes the emotional and mental harm he inflicted on her by forcibly raping her and forcing her to engage in oral copulation.  Although Johnson was only 20 years old in early 1991 when he suffered his prior strikes (three counts of attempted murder, one count of voluntary manslaughter, and one count of mayhem) for which he was sentenced to a prison term of more than 19 years, he was middle-aged (over 39 years of age) when he committed the forcible sex offenses against Doe in September 2010.  We conclude Johnson's sentence is not grossly disproportionate to his culpability, it does not shock the conscience or offend fundamental notions of human dignity, and thus it does not violate the state and federal constitutional prohibitions of cruel or unusual punishment.

## DISPOSITION

The judgment is affirmed.

NARES, J.

WE CONCUR:

HUFFMAN, Acting P. J.

O'ROURKE, J.

46